Case number 20-1206 et al, Delaware Riverkeeper Network and Maya Van Rossum, the Delaware Riverkeeper Petitioners versus Federal Energy Regulatory Commission. Ms. Manahan for the petitioners, Delaware Riverkeeper et al. Mr. Blasey for the petitioner, West Rock Hill Township. Mr. Fish for the respondent. Mr. Marwell for the interviewer. Morning, counsel. Good morning. May it please the court. My name is Casey Manahan representing petitioners, Delaware Riverkeeper Network and Maya Van Rossum, the Delaware Riverkeeper. Thank you. I will be addressing you. You will represent that petitioner and the arguments on behalf of the West Rock Hill Township will be presented by Mr. Blasey. Yes, your honor. Thank you. All right, please proceed, Ms. Manahan. This challenge is about FERC's blinkered view of a pipeline project's environmental impact and unquestioning acceptance of the applicant's business goals, which led it to conclude that the Adelphia Gateway Pipeline was required by the public convenience and necessity. Counsel, may I ask a question at the threshold? I'm sort of stunned by the number of arguments presented in the brief. I've always thought that when an appellant or a petitioner raises that many arguments, they lose a little bit of focus. Would you tell me what you think your two strongest arguments are? Yes, your honor. Well, our two strongest arguments here are essentially that FERC failed to take a hard look at the proposal. That's a general point. Go to the specifics. Which specific errors do you think they made? One of the specific errors that they made, your honor, was not considering the upstream-downstream impacts, essentially the impacts associated with the production and burning of the natural gas, which has an effect. Are you talking about downstream or upstream? Well, both, your honor, and it stems from the same error, which is a failure to follow the NEPA regulations, and specifically that section 1502.22, which is now 1502.21, which requires them to seek out information about impacts, which they, in this case, they chose not to do. And if the information regarding those impacts is not available, to use alternative methods of measuring those impacts, which is an error that they committed in considering upstream impacts, downstream impacts, and the climate change impacts of the project. Are you talking about that cost figure? What are you talking about specifically? Well, in the context of measuring the significance of the climate change impacts of the project, the social cost of carbon is a method that we believe that FERC was required to use because it's generally accepted by the scientific community. I have several questions concerning that. This is an environmental assessment. This is not an EIS, right? Correct. And why would you take the position that the social cost has to be measured in an EA, the preliminary step to just determine whether it's significant or not, if you require that to be used, which is the most difficult calculation you could possibly come up with? Aren't you merging the EA into the EIS? Aren't you saying the EA doesn't work anymore? You have to go to an EIS from the very beginning? Well, Your Honor, our position is that FERC should have performed an EIS, and it should have, in that EIS, considered the social cost of carbon metric as a way of measuring the climate change impacts of the project. In other words, it was, in your view, arbitrary and capricious to just use an EA. Well, yes, Your Honor. And as a first step, agencies, of course, can begin with an EA to determine the scope or the nature of the environmental impacts. But the EA also comes to the conclusion that there was no significant impact, which here is arbitrary and capricious without even measuring the significance of the climate change. There's no requirement to use the social cost in the EA. It's an option, but there's no requirement. You can say there's a requirement in the EIS, but it's certainly not in the EA. It's an option, right? The EA is used to, as an initial matter, try to get a grasp of the scope of the environmental impacts of the project and to measure the significance. They are required to measure the significance of an impact in the EA. They don't have to use the social cost calculation in an EA. They may have to use it in an EIS, but not in an EA. They would have to use it in the EA, Your Honor, in order to measure the significance. That's not the way I read the regulations. The regulations say it's an option. Also, counsel, can you address whether and to what extent this very discussion was had before the agency? Because I didn't appreciate that you had made this point. The discussion of whether and to what extent the EA versus EIS required the use of the social cost of carbon tool. I'm trying to assess whether or not this is even something that you've preserved. Yes, in our comments, we had specifically noted, this is in the record number 890. It's not in the joint appendix, but record number 890 at page 60. We stated, the social cost of carbon is a scientifically derived metric to translate tonnage of carbon dioxide or other greenhouse gases to the cost of long-term climate harm and remains generally accepted in the scientific community. And we went on to say that cost monetization is an appropriate tool here where there are alternative modes of NEPA evaluation are insufficiently specific. Did you say that the applicable regulations require the use of that tool in the EA context versus EIS? I thought that was the conversation you were having with Judge Silverman right now. Yes, for specific, well, we did cite the section 1502.22 provision in support of that statement. In the context of an EA or an EIS, here, we would say that there's essentially when you need to measure significance, when you need to conclude that there is no significant impact, that is the method by which you should measure significance based on the regulations provided by CEQ. So, can I just clarify so I understand? I understand you may have argued that, let me back up. I thought your argument was that the EA was arbitrary and capricious in part because the agency had declined to measure certain emissions and to the extent that the agency had, in a number of cases, repeatedly rejected the use of the social cost of carbon. You suggested that there was a way for the agency to measure this impact. Isn't that the nature of the argument that's being made to the agency? What I'm just trying to be clear about is, from the beginning, I thought your position was that the agency had to do more than an EA, where it was rejecting using measuring tools that were available. The agency explained why it wasn't using the social cost of carbon. In other words, yes, I'm just trying to understand. The agency and the agency counsel can tell me I'm wrong, but wasn't it obvious to the agency what the petitioners wanted the agency to do? And the agency's response was, we have determined that it is not possible for us to do this for the following reasons. And you and the others challenged that reasoning. Isn't that how the case comes to us? Correct. Yes, the reasons that FERC put forth for not using the social cost of carbon were not responsive to their obligation to use generally accepted scientific methods, such as the social cost of carbon, which in the past they have not contested that it is generally accepted in the scientific community. And they also did not address our argument about the fact that monetized measures, economic measures, are appropriate in the context of NEPA. It does not need to be tied to a specific environmental harm at a specific site. The social cost of carbon is a completely valid way of measuring the significance of the impact of climate change. I hear you saying, and I tried to write it down because there's no transcription live right now, that the reasons that FERC gave were not responsive to their obligation to use this tool. And so what I'm homing in on is whether when you argued before FERC, you said you have an obligation to use this tool because it is scientifically valid or whatever. Or were you just arguing that it's scientifically valid and you should use this tool, it's a good thing, other people have used it, et cetera. I understood your prior argument to be more in the nature of the second kind of discussion, as it has been before FERC and they use the same arguments as to why they have chosen not to use it. But I did not perceive you to be making an argument that the law, some regulation, creates an obligation to use this tool under these circumstances. So where in the record do you say, FERC, we're not arguing as a persuasive matter to you about how good this tool is. We're saying you have no choice. Do you say that somewhere and was there a discussion? And this implicates Judge Silverman's concern or argument, which is, if that was the nature of your discussion, is that true? That in the EA context, they have an obligation to use the social, you know, this tool. Well, what the regulations require for to use is a generally accepted scientific method to measure the significance of the climate change impacts of this project. We have we and many others have put forth the social cost of carbon as exactly such a method. So to the extent that there is no other method identified in the record or otherwise, they are required to use a generally accepted method, which they have also agreed that the social cost of carbon is. And essentially, you know, the first. Beyond just the climate change impacts, FERC failed to completely account for both the upstream and downstream impacts of the project in the context of upstream impact. The the production of natural gas is an indirect effect of the project. Certification would result in a reasonably foreseeable increase in availability of natural gas. But here, FERC argued that because of the interconnected nature of natural gas pipelines, it somehow has no way of determining where the gas is coming from. And asserts that there's no data in the record showing that the project is even necessary to bring the gas to market. Simply because the gas will travel through another pipeline first does not mean that the increased production is not reasonably foreseeable. It doesn't remove it from the realm of impacts that it's required to consider under NEPA. And as Commissioner Glick recognized in the 2018 dissent, adding capacity does spur demand. And if a proposed pipeline neither increases the supply of natural gas nor decreases the price, then it's hard to imagine why that pipeline would be needed in the first place. Here, we're not asking FERC to hypothesize about where the natural gas would be produced. Rather, they must follow the NEPA regulations, the regulations cited previously, Section 1502.22, to at least first attempt to obtain the information. And if they cannot obtain the information for whatever reason from the applicant, then they need to take the next step, which is to use other methods of determining what the upstream impacts are, such as using the structure of the interstate transmission gas lines and using historical data about well usage. But isn't all of that beyond the, isn't it sort of the upstream? Isn't that really speculative in a way that is unhelpful? I mean, how can they possibly know what, unless in the absence of the kinds of data that you say they can't get? So they try, they ask for data, they try to sort of, based on what facts exist, predict. But if they can't do anything more than that, I don't understand why it wouldn't just be sheer speculation as to how this pipeline would affect people upstream. Well, in this circumstance, they didn't ask. They didn't take that first step of trying to get the information about where the gas would be sourced from. And essentially that's where they erred at first. And then secondly, as we put forth in our comments, there are methods of determining where gas is likely to be produced. And I think one of the main things that we should focus on here is that what this is, is a certificate for a pipeline saying that it's necessary. This pipeline is needed. We need the gas to be transported on this pipeline. We need the gas. Well, haven't we said many times that, I mean, they looked at precedent agreements. They looked at, they had individual purchasers, I think, that they included. And haven't this court sanctioned that kind of analysis and reasoning in the past? Well, specifically, and most recently in this court's opinion in Burkhead, the court left open the circumstance under which a petitioner, such as Riverkeeper, claims that the commission didn't seek out the information needed to make those upstream determinations. And that is what we're claiming here. And in the context of the precedent agreement, our argument is that they failed to rationally explain why the project has a market need because they relied exclusively on those precedent agreements. Excuse me, so may I ask you a question? I got a little confused. Do I take you to be arguing that the NEPA issue is to be, the agency is wrong in first deciding whether there's a need for this pipeline, whether it's in the public convenience and necessity? And then secondly, looking at NEPA, you seem to be suggesting that NEPA is wrapped up in the first step and that it's arbitrary and capricious for the agency to divide it into two steps. Do I understand you correctly? Your Honor, I'm sorry. The first step is, could you identify the first step, please? Well, the first, the agency looks to see whether there is a need, put aside NEPA, it just looked to see whether there is a need for this pipeline, right? Public convenience and necessity. Then it looks to NEPA. Did you suggest that that's wrong? That you had to look at NEPA in the first step to determine whether there's public convenience and necessity? Do you make that argument? I got that impression. The NEPA analysis informs the ultimate conclusion that the pipeline is required by public convenience and necessity. So, in other words, you're challenging the agency's practice, which goes on forever, which is you first decide whether there's a need for the pipeline, public convenience and necessity, and then you look to NEPA to see whether there's an environmental impact. Do you challenge that? No, Your Honor. The need, they do determine the need, and then the need is balanced against the adverse impacts that are considered in the NEPA analysis. So, you agree NEPA is the second step? Second step. FERC has stated in the past that they do both at the same time. Essentially, they proceed, the environmental analysis proceeds at the same time, but yes, the adverse effects are considered. I second. Oh, then I misunderstood your brief, because you're not challenging that. Not exactly, Your Honor. We're challenging the fact that they accepted the applicant's assertions of market need without looking further beyond the precedent agreement, which then, you know, that essentially changes the balance. That goes to the first step, public convenience and necessity, not NEPA. Well, then the NEPA analysis was also similarly deficient, which then minimized the adverse effects of the project and threw off the entire balancing inquiry, which is what FERC takes part in when it concludes that the project is required by the public convenience and necessity. So, essentially, our assertion is that it's been skewed by the fact that FERC did not look beyond the precedent agreement to determine need. In other words, look beyond the precedent agreement to look at other market factors, other indications that perhaps this gas is not needed. And then, in considering the adverse impacts of the construction and operation of the pipeline, it failed to consider upstream impacts, downstream impacts, climate change impacts, and also the connected project, the Pennies Pipeline. So, those two errors threw off the entire Natural Gas Act balancing inquiry that FERC takes part in when it decides to certificate the pipeline. Anything further? No, Your Honor. I see I'm over my time. That's fine. We asked some questions. All right, counsel for West Rock Hill Township, Mr. Blasey? Mr. Blakey? Thank you. May it please the court, my name is Doug Blasey. I am counsel to West Rock Hill Township. I will be seeking to address what I would call micro issues in this dispute where Ms. Nanahan, if you will, I'm putting words in her mouth for her, but kind of the macro issues. And if Judge Silberman were to ask me were there two kind of precise things we're concerned about, I will get to them in greater detail. But there are, one is the site chosen for a new compressor station is an existing piece of property in Quaker, called the Quaker Town site, which is 1.5 acres. And it now contains, I think, a meter station and a pipeline. And that's it. There is no compressor station there. And there is a nearby 41-acre property that has facilities, has the same pipelines, and has electric utility lines on it that was rejected, essentially, by the applicant and FERC as being more suitable. And we say, and I'll show you shortly, both FERC, PHMSA, and FEMA documents that suggest, in general, compressor stations should be on a minimum to 10 to 15 acres, and normally or often can run up to 40 acres, and that's an industry practice. So we find it shocking and dangerous that FERC approved putting an industrial facility on a 1.5-acre site and did not adequately consider the impacts on all the neighbors. So that, in short, is what I'm going to focus on and why I call it the micro-issues involved here. And we think the environmental assessment, which, by the way, at least from the old days, when I was more active in the federal government in doing these things, an environmental assessment wouldn't necessarily run 331 pages. So it's a practice now, it appears, by FERC to put an awful lot into the environmental assessment. That's good or bad, Mr. Blasey. Well, it's... It will hurt you. It becomes more mechanical, is what I'm really suggesting, Your Honor, that they've kind of mechanized the process, and then having done the EA, they can move either to an environmental impact statement or a FONSI, finding there's no significant impact. And I suspect, I haven't done the statistics, that fairly generally there's a FONSI that follows, and they don't need to do an environmental impact statement. Now, if they had addressed our concerns fully in the EA, I wouldn't be here. But I think they would be more likely addressed fully if there was an environmental impact statement, because that's where alternatives need to be assessed in detail, the hard-look doctrine comes in, and also cumulative impacts would be involved. So the environmental impact statement process, kind of a necessity, pushes you further. But what we're objecting to now is essentially the back-of-the-hand rejection of what we think are very germane local safety concerns, and disrespecting the role of local government in trying to protect other neighboring uses from what is a significant industrial facility on a postage stamp-sized property. All right, so what's your understanding of FERC's reason? I mean, it's not, you say they did an environmental, we see they did an environmental impact, excuse me, assessment. They did address this issue, and so what, why is it insufficient for them to come to the conclusion that the site that you prefer would have, require a larger facility, et cetera? It's kind of a compound answer. I feel they never explained or justified the use of a small site. That's the core reason. Now my township, my client would prefer the alternative site to begin with, because it's not in their township. But if it were to be located in their township, this acreage and size should be sufficient to protect neighboring uses. So the reasons given by FERC we find are inadequate. It basically says for the site it chose, oh, it's one, the compressor station itself, now this is a fairly large structure, because it's going to be 1.2 acres of building, heavy footings and foundations. It's an industrial structure, 40 feet high, where there's none there now. It will fit, because the applicant owns 1.5 acres there. But then when it publishes guidance, and they're in the record, this is the cover page of the FERC guidance, what do I need to know about an interstate natural gas pipeline on my property? They talk about generally compressor stations on 10 to 40 acres. And another document by FEMA and PHMSA, also referenced in both our argument and briefs, this is called hazardous mitigation planning practices for land use planning and development near pipelines. There when they talk about compressor stations, these two federal agencies say generally these stations are placed on 15 to 40 acres. So for FEMA, or FERC rather, in its decision to simply say, oh, it fits on 1.5 acres and be silent on the safety implications of what is a very different facility than a pipeline in the ground with a right-of-way, we find is inherently arbitrary and capricious and unresponsive to its duties, even in the EA process. Forget getting to the environmental impact statement. They need to explain to people why what they're doing is appropriate, and if there appear to be contradictions in the process, explain them away, justify it. So what do people at the end of the day feel or know? Oh, the government's treated me fairly. I understand its decision. I was either right or wrong on this. The things I was right on, they kind of changed to deal with. And where I misunderstood something, they've explained it so I can go home and sleep at night. We have people that are afraid to be near this facility because they have no such justification, Your Honor, and that's what at core we find wrong. Now, the second issue is when it came to talking about the alternative, which in an EA they don't have to do as completely, they kind of ignore the fact that it's 41 acres. 41 acres with the same pipelines going through them. 41 acres that has a high-tension transmission line going through it, so if they did need electricity, there's plenty of it there. And say instead, oh, it's 2.3 acres because they've only used 2.3 acres. Are you saying they didn't say anything about the downside of putting it on the alternative facility? They did, and we thought those were fairly shallow reasons, but they supported it by saying, oh, they're only using 2.3 acres. So they never really addressed the size availability and the isolation potential that that site would offer for a new compressor station being located. Now, you could have done it elsewhere. If they thought there were downsides, and these are fairly, I can talk about them, but they're speculative, they could look at the site where they are, then acquire enough property so that you can safely build it there. Instead, they've done it on what I call a postage stamp, and the neighboring uses are all residential. They could be within 25 feet of the fence line. FERC FEMSA rules suggest, oh, we've got to be concerned about neighboring uses that might create a fire hazard to the compressor station. Forget the compressor station being a hazard to us, but talk about the neighbors. You could have a backyard barbecue. You could have a fire pit. You can have your kids running a motor, what do you call them, those little hot rods, motorized hot rods. You've got to cut your grass, and you're 25 foot away from a compressor station that's near the fence line. So these are among other things. Now, one other thing with the postage stamp size lot, there wasn't adequate room to move around it with emergency equipment, which is another... I'm sorry to interrupt you. No, no, please. Were these concerns, what you are expressing now, raised to FERC in the period of time that they discussed? I'm not sure I can... Were these concerns... I missed your verb. Were they raised? Yes. Were they brought to FERC's attention? Yes. This lot is too small, et cetera, et cetera. Is that in the record? And we did it in three steps, Your Honor, and they're kind of laid out in the brief, but let me quickly do it. The first one, and it was before my involvement, so they weren't thinking per se only about environmental impact statements and the permitting. They were thinking, the township was thinking about local zoning and setbacks. So the first set of comments the township filed early was about zoning and our setbacks, and we think this is too tight. Then when that seemed to be being rejected, they came to me and they asked, and we looked for an environmental and engineering consultant to try to go into it in more detail. So a second set of comments went in and was accepted by FERC, by RT Environmental Services, looking at safety setbacks, fire hazards, and other components of site design, where we found this inadequate and submitted that in great detail, and then started to raise the pamphlet issues themselves and show other fire sites. And then when that again seemed to be being rejected in the order, in our petition for rehearing, we submitted all of these issues again in greater detail, including the pamphlets, to make sure they were in front of the agency. So as a matter of administrative law, having fully presented the various concerns that you have, what is arbitrary about FERC's consideration of those concerns and its rejection? Are you saying that they weren't sufficiently responsive in the sense that they didn't tell you, they didn't respond to your comments? I mean, your argument, as a matter of administrative law, I'm struggling to see whether your argument is just FERC chose something we disliked and we told them very much that we disliked it and we gave them other options and they rejected them, or that they've done something that we have considered to be a violation of administrative principles because they haven't looked at what you've given them, or they haven't explained why it is that they rejected it. So are you in the administrative law world or in policy world in terms of your objections? Well, there can be disagreements over policy, and there's deference to an agency making it. But I would say there's both substantive and procedural failures. The questions we raise we think deserved greater investigation than provided. Now, I would say that falls to the FONSI, which I think was inappropriate and not justified. And if you then don't have a FONSI, you do an EIS. So these would have been developed more fully, investigated more fully in the EIS. Now, on the substantive side directly, I think to have a bulletins and publish to the world these pamphlets and describing things, and I'll mention a Third Circuit case in just a moment, the FEMA one is 40 or 50 pages. Not all on compressor stations, by the way, but talking about what is normal in the industry. Now, I think they want to talk normal rather than hazard, because I think there's a greater hazard here, and that's a little bit a no-no to address. But if you're saying 15 to 40 acres or 10 to 40 acres is the normal, to then in your record say, oh, 1.2 is enough, 1.5 is enough, and that's good enough. That's not good enough to not be arbitrary and capricious decision-making in my judgment. You've got to explain it. Now, maybe you say, oh, this is like a nuclear reactor. We're putting 10-foot concrete walls around it. There can be no this. There can be no that. We don't need that larger space in this setting. There's none of that. It's just that trust us. We think it's OK here. And then when you say, well, you do have an alternative site that's got plenty of room. Oh, well, they don't want to use it. And by the way, it's only 2.3 acres when it's 40-some. So it's casual the way these issues are being dismissed. That's really what it amounts to. Now, an immediate neighbor, the McCarthys, who I've been authorized to say a few words on behalf of, which support our position, are immediate and are concerned about noise and vibration. They submitted documents and references to documents that they thought made their properties unlivable. They feel they never got adequate response. So if you look at our briefs on these things, we're the locals who feel we're adversely impacted and we're not being treated in a transparent and fair way. Lastly, let me just say one last thing here regarding the township. It's a unit of government. Yes, the federal government's much bigger. Clearly has some preemptive rights here and authorities as forecast, but has been told to work in cooperation with other governments that have responsibility for public health and safety. So the township, which has a land use and zoning role, wants to be able to tell its citizens that the immediately adjacent residential zoning is lawful and safe. Now, if it feels it can't do that, given these tight boundaries and the concerns we've expressed, and tries to put conditions on the future use of that property, it runs afoul of condemnation, eminent domain, taking the property rights. So the township is trying to say to its neighboring government, FERC, help us, serve with us to articulate a result that people feel confident is safe to them and to the immediately adjacent uses. And that's what we feel has been lacking in the way these kind of narrow or micro points have been dealt with. It's okay, trust us. We're here from the federal government and you can do that. And that's not an answer. Or procedural in terms of the EIS process. All right. Thank you. Why don't we hear from a respondent? FERC? Mr. Fish? Good morning, your honors, and may it please the court, Jared Fish for the commission. If I may, I'd like to focus on four issues that appear to be where the panel is focusing, social cost of carbon issue, the upstream downstream indirect effects, the issue of market need and our balancing, and Quakertown compressor station. The first matter on social cost of carbon issue, petitioners did not preserve this issue for this court to confer jurisdiction on this court. Ms. Manahan quoted a statement from their comments on the environmental assessment record 830. The argument has to be made in a rehearing application to the commission after initial orders issued. That is not a quote from the rehearing application. So it's not preserved on that basis alone. Now, looking at the hearing application. Did they cite a regulation in the hearing application? Your honor, they cited a sub provision of that regulation, 1502.22B4. But their argument was not that even if you accept the commission's reasons for not using the social cost of carbon tool, you still have to turn to theoretical generally accepted practices in the field because you can't rely on only ideal methods. They did not make that argument. To the contrary, they argued that social cost of carbon tool is the best out there. They said we perfectly could measure the economic significance of greenhouse gas emissions. How do you distinguish the circumstances in terms of preservation in this case from the Sinos, which I understand had a similar kind of scenario? And this court held that they had preserved it. Correct, your honor. But there, and this is in the addendum to our response to Delaware River Keepers 20HA letter. There, the petitioners expressly stated that the commission can't just rely on universally accepted methods. They have to look to less than ideal methodologies because this regulation compels that. There is no argument that even if accepting FERC's explanation for rejecting the tool as true, this regulation still says, no, you can't just rely on ideal information. We accept that sometimes there's unavailable or incomplete information. Then you have to turn to theoretical approaches. All Delaware River Keeper argued was this is the best out there. In fact, the next sentence after they cite the regulation is to say the social cost of carbon tool is better than other methodologies. And they say that because it monetizes environmental impacts. Well, I don't understand your point. I mean, if the agency has rejected that methodology and given its reasons, and the petition says, basically, we disagree with those reasons. It's the best out there. So you have to use it. What more has to be said? Well, I personally agree with your honor. And I would rest on that explanation if it wasn't for Vecino's. Vecino said notwithstanding our reasons for rejecting the tool, we still have to consider it under 1502.22b. But I also have a merits answer. Let me just be clear. There are many ways of making the same argument. The fact that the argument wasn't a copycat of Vecino isn't dispositive, is it? Well, it is in this case, your honor, because then you just have competing allegations on whether the tool is good or it's not or it's not useful. And the commission gets deference for highly technical judgments in determining that this tool actually is not useful because there's no settled on discount rate. There's no generally accepted method for measuring the incremental impact on the environment using the tool. And there's no criteria for monetizing which impacts are significant for NEPA purposes. So you just have competing substantive arguments. Did you take the position that whether or not it's useful is more appropriate at the EIS stage than the EA stage? Well, your honor, I would take one step back and say we said that we did measure significance here. And that's what petitioners say we needed to use the social cost of carbon tool to do. But we actually did measure the significance of the emission. We placed we measured the amount of emissions going to the Kimberly-Clark plant. I understand that. Did you take the position that you didn't have to go to the social cost at the EA stage? I don't think we said that specifically in looking at the EA versus the EIS. It wasn't presented to us in that way in the hearing application. But so we didn't really have an opportunity to address that. I see you're saying the petitioner did not raise the allegation or the argument that you had to use the social cost. Well, that would put us into EIS land versus EA land. They just said you have to use it to measure significance. And your position was? Our position was, as we have said before, and this court has upheld before in her support, Sarah Club Appalachian Voices, that the tool is not appropriate for project level reviews of environmental impact. And, you know, this is where I just clarify, because I understood you right now to say they said they had you had to use it. Or did you mean they said you should use it because it's the best available, et cetera? What I'm trying to tease out in terms of understanding preservation. Is whether they made an argument that was essentially an hour of a hour, I mean, the case, you know, a kind of interpretation argument that based on what this regulation says, as long as we can demonstrate that it's scientifically, whatever the language is, scientifically a good tool or whatnot. You then have to use it. Or were they just saying this is such a great tool. You should use it. At which point you repeated the various arguments that you had all along about why you think it's not that great. The latter, your honor. All I read, all I read them to be stating is, you know, the only reason they even cited the regulation was to quote the phrase generally accepted in the scientific community. And they made no argument on that point at all. So that distinguishes this from Bacinos. But there's to get to Judge Silberman's initial question to Ms. Manahan, just looking at the text of 1502.22, it does not apply to environmental assessments. It applies by its terms to environmental impact statements. And it also states this regulation comes into play when an agency is evaluating reasonably foreseeable significant adverse effects. Well, if you're already evaluating a fact that the agency is deemed to be significant, you're in EIS land. You're not in EIS land because the whole point of conducting an environmental assessment is to determine whether there are significant effects in the first place. So even I would say that to be. So I think that discussion about EIS versus EIA also sort of implicates the preservation question, because what you would expect that someone who was seeking to preserve this argument would have made that point. In other words, they would have said, we understand that the regulation that we're pointing to only applies in EIS, but we are saying that you are required to do this in the EIA context as well. Another question about preservation is in this context in general, isn't there a requirement, like in a rehearing context, that you have to be very clear on what it is that you are arguing from the standpoint of preservation? Absolutely, Your Honor. And I think that's why Ms. Manahan referred back to their comments on the EA and completely ignored the very little that they said in their rehearing application. The focus here is on the rehearing application. This court has said time and again in Ameren, in Allegheny Power, that the rehearing requirement is applied punctiliously. Any objection has to be made explicitly and anything short of that, any indirect objection, or as we have here, an incorporation by reference, by way of citing in a footnote a subprovision of a regulation, does not meet that requirement. So we have both procedurally forfeited or jurisdictionally forfeited. And even if it wasn't, it's wrong on Ameren because we're in EA land, not in EIS land. But the broader point is we did measure significance. We didn't need to use a social cost of carbon tool. Petitioners repeatedly state that an economic analysis is necessary here, but that's belied by the regulations. 1502.23 expressly says we don't need to conduct a cost benefit analysis. Moving to your next, you had four points I think you wanted to make. You said we measured significance. Wasn't there at least a circumstance in which you actually didn't undertake to measure significance, or at least the impact, and that is with respect to the downstream impact of the greenhouse gas emissions on a certain segment of the pipeline. Can you talk about that? Why are petitioners wrong about your obligation to do that and the fact that you didn't do it in this circumstance? Right. So, Your Honor, I want to be clear. We're all talking about the same thing. There's a lot of gas being transported on this pipeline. Petitioners don't challenge the fact that we didn't measure the downstream impact from the 525,000 decatherms that are transported on Zone North because that's just pre-existing service. This certification does not cause any new environmental impact. They're not challenging our measuring of the gas point of the Kimberly-Clark plant. All they're challenging is the 100,000 decatherms on Zone South. Any determination about the resulting greenhouse gas emissions is speculative in that case because we don't know the destination or the end use. You heavily said that under those circumstances, you can make reasonable inferences, right? Isn't the record such that it's pretty clear that an overwhelming percentage of natural gas being piped in this way is combusted? Why didn't you make those kinds of assumptions and calculate it consistent with that? Well, I have a couple answers to that. First, Your Honor, I don't know of any case that says you can take a gross estimate of generalized impacts across the country and apply that to a case-specific project-level review. As this court said in Burkhead, quoting this court's long-ago decision in Calvert-Cliff, NEPA requires case-by-case, fact-specific analysis on this particular project. The question is whether the downstream impacts are reasonably foreseeable for this project. Yes, but okay. Fine. So we have the facts of this case, 100,000 or whatever decatherms Zone South. We've narrowed it. And you're saying the reason why we didn't try to calculate the greenhouse gas emissions that would come from the transportation of that is because we didn't know where it was going. First of all, there is a footnote in the record at one point where you speculate that it is going to a particular place or at least part of it, right? Isn't there some discussion I'm trying to find in my notes quickly here? Calpine, don't we talk about Cal, at least some of it is going to Calpine? No, no, Your Honor. No. And we expressly stated that in the certificate order, in the hearing order, we don't know it's going to Calpine because there are no agreements to take it there. Actually, what Adelphia found out when we asked them, we did our due diligence under Burkhead. We asked the pipeline whether they knew the end-use and destination, and they responded that it was that 100,000 decatherms was being transported further to the interstate grid, either on the Columbia pipeline system or Texas Eastern. That parkway lateral that we're talking about goes to the Calpine plants, but it also goes to the Columbia interstate system and the Texas Eastern interstate system. And so what they know is it goes onto the interstate system, not to the Calpine plant. Okay. Even so, haven't we said in stable trail, at least, that the lack of knowledge of the end-user doesn't absolve you of trying to estimate what might happen on the assumption that it's all going to be combusted? Why can't you give the upper limit of the potential impact, and then maybe it won't be and we'll all be happy, but at least you wouldn't have tried to estimate assuming that it is all consumed. Why don't you do that? No, Your Honor. I respectfully disagree that that's what stable trail and Burkhead say. If that was the case, where if it's transported on the interstate system, and because we know nationally most gas is combusted, that we have to assume that this gas will be combusted, then Burkhead's rule statement that it's not correct that in all cases it's reasonably foreseeable gas will be combusted, where they agreed with the commission on that, that statement is nullified. There's no meaning to it. And further, Burkhead said, they didn't stop at saying, we should have just foreseen that the gas would be combusted because someone might reasonably think that. They said, they spent pages saying, actually, no, we agree with the commission. We're crediting the commission statement that end use and destination are important. And the problem there was that the commission had not asked the pipeline, the pipeline for that information. I understand, but it seems to me that your argument would make more sense if there was some other alternative out there. If we were in a world in which 50% of natural gas is combusted and 50% of it is treated in some other way. And you say, we don't know which way this is happening, so we can't make the estimate. That's one thing. But I thought there was testimony or something in the record that suggested that like 98% of the natural gas actually ends up in this way. So doesn't that impact the reasonable foreseeability analysis? I know, Your Honor, not here because, again, we're talking about the specific project. That 97% figure does nothing to answer whether the particular gas here is going to be transported to, say, a chemical plant and be used as feedstock. And for their part, Riverkeeper concedes that. If you look at Riverkeeper's arguments, pages 29 through 30 of their opening brief and page 10 of their reply brief, they agree with us that more information would be useful to determining whether combusting this transported gas is reasonably foreseeable. They say, we should have asked the shipper. We should have gone beyond Adelphia, tried to find out any use and destination from the shipper. Well, that argument is jurisdictionally forfeited because they didn't make it into a hearing application, so it's not properly before the court. But on the reply brief, they actually doubled down on that point. They say, yes, it's perfectly possible that the gas transported here could be used as feedstock as opposed to being combusted. But they say, we have this 97% figure, so forget about the project level case-specific review. Just go with that number. And think of the implication. If it's enough to just use gross national statistics to determine project level impacts, what does that mean for determining impacts on wetlands of a particular project or a forest service timber sale? Can an agency just rely on gross national generalized figures? Here's the problem, Mr. Fish. It seems like we are in sort of a zero-sum game world. In other words, fine, I hear that it's a project level thing and we really shouldn't be relying on national statistics about what's going to happen to this gas. But it appears as though FERC plugged in zero. I mean, your assumption as a result of saying we don't know where it's going is we're assuming that it has no impact. So that can't be right. I mean, there must be something that comes with this. And so I'm trying to understand why it would be reasonable or any more reasonable to allow the agency to assume that there is no effect just because we don't know what the end user is going to be. Yeah, I disagree, Your Honor. First of all, our responsibility under environmental assessment as set forth in Myersville is to make sure we have not ignored any issue. Not that we've resolved every issue, but that we have not ignored every issue. We considered this. And the test is whether an impact is reasonably foreseeable. So that necessarily means that some impacts might not be reasonably foreseeable, even though they will occur. Our inquiry does not depend on absolute knowledge of what an occurrence will be. If it's not reasonably foreseeable, we don't have an obligation to speculate. EPA is all about not speculating, to speculate on what that ultimate effect would be. And I just reiterate, this court before has upheld a finding of no significant impact where the commission had less than complete information on downstream significance. And Judge Rogers' opinion in IRF reports dealing with greenhouse gas emissions from a liquefied natural gas facility, the commission said we don't have a reasonable metric for measuring significance of those greenhouse gas emissions. And we stated our reasons why. And the court upheld that. They upheld our FONSI. So we're really not in new territory here. And if it was true that we could, we're obligated to speculate based on gross national statistics, then all of that discussion and all of that instruction in Birkhead that we've taken very seriously about trying to gather information on end use and destination is superfluous. And I'll just add, it's not as though if, you know, this is really an extreme case where there's really no information on where the gas is going after it's put into the interstate pipeline. I can think of other instances where we might not have the perfect information that we had in Sable Trail, where it would be a closer question. Say we knew the destination of the gas, but it's a big industrial facility that includes both a power plant and a chemical plant. So in that case, we would know the destination for the gas, but we might not be sure on any given day what the end use is. Well, maybe that presents a closer question because, you know, it's at least, you know, some of the times going to a power plant and some of the times going as chemical, as feedstock to a chemical plant. Maybe that's a closer issue, but we're not in that land here. Petitioners are asking us to engage in total speculation about what's happening to this gas. And this court's case law respectfully does not require that. If one is to assume that the gas will be combusted at some point, somewhere nationally, and you had to assume that in every case of a pipeline, would that shut down all gas production? Or gas transportation? I'm not sure, Your Honor. Not just gas transportation, gas production under first jurisdiction. I mean, it could, well, we would still, you know, we're talking about a NEPA review here. So even if we had to, you know, make that assumption, I guess, you know, because NEPA is action forcing and does not command a substantive result, maybe there still would be some discretion there. But if we had to assume that we had to speculate, I guess is a way I would rephrase, I hope, fairly your question, Your Honor, then, you know, we would be engaging in speculation here. And this court's case law expressly says we can't do that. If I might turn briefly to the upstream, well, I see I'm out of time. I can turn to the upstream impacts or... Why don't you give us a brief sentence or two? Okay. Your Honor, the petitioners assume that upstream gas production is a reasonably foreseeable proximate cause of this pipeline. And we explained thoroughly paragraph 243 of a certificate order, J596, and we're hearing paragraph 123, J897-98, why that's not true. We explained that the causal arrow generally goes from well production first to pipeline construction, that well production is more dependent on changes in gas prices, changes in construction costs, changes in national market demand. But we also said, even if you assume the causal arrow goes the other way, and that it goes, you know, you build a pipeline first, and that induces new construction, well, we don't know that any well field where this gas is coming from doesn't have another outlet to reach the market. And if that's the case, that breaks the chain of causation, because we don't know that this pipeline, rather than the other pipeline, actually induced that new production. In other words, your argument, this is not equivalent to the baseball field in Iowa. Just because you build it doesn't mean it'll come. Right, exactly, Your Honor. Well, but what I'm hearing, if it's big, it's too big for us to figure out what's happening. Well, in this case... And that's not the assumption underlying the statutes calling for FERC review, much less the regulatory system. Well, Your Honor, this court in Sierra Club versus Department of Energy said, those upstream impacts are not reasonably foreseeable, in part because we're talking about a highly reticulated interstate natural gas pipeline system, where on any given day, gas could be coming from, you know, a source field in northeast Pennsylvania versus a source field in northwest Pennsylvania, or another state entirely. What I'm trying to address, though, is that type of argument makes a mockery of the statutory scheme Congress enacted with the idea that FERC, for example, is going to give serious consideration to the objection and do the best it could. No one's asking for it to be, you know, a miracle worker here, but the notion that the expert agency created by Congress is unable to provide any guidance here, once it decides, well, there's more than one multiple, or there may be multiple explanations, is troubling. And I agree that our court has endorsed this approach from time to time, but it seems we're getting to the point where analysis is becoming more sophisticated, and if we need to develop, or if the industry needs to develop, tracer systems, we can develop tracer systems. But the notion that big means it's impossible to evaluate. I don't know what's left of Congress's creation of FERC. It's going to be a rubber jam. The bigger a project is, the less it can do. No, Your Honor, I respectfully disagree, because you could, first of all, you could envision a scenario where, you know, developers want to build a new greenfield well site for natural gas, and they say, we need a pipeline company to build a pipeline to get it to market. And so this pipeline is built, or the pipeline is, you know, built, and that's enough to induce that well production at that particular site. Well, then we have, you would have causation, or at least it's a closer question, whether you'd have causation. Oh, I understand there'll be some projects, but what I'm suggesting is, and the pipelines are savvy as to what's happening in the regulatory field and in the judicial field. They know how to put these packages together in order to present FERC with the conundrum it has identified. So I don't think either of us has to speculate about that. That's what we're seeing. And what's left of the regulatory scheme is concerning. That's all I'm suggesting. And I'm not suggesting that our court hasn't said, well, you know, it's up to Congress to do more if it wants more out of the agency. But haven't we more or less reached that point? Well, I agree, Your Honor, one way would be for Congress to enact legislation that says we need to take a different route here. But I'd also say, first of all, Riverkeeper's arguments on the impacts here, the upstream impact they want us to look at are highly localized. They talk about new water lines, new roads being built. Those highly localized environmental impacts will vary from one location to another. You can't, it kind of goes back to the 97% general growth statistic on downstream. You can't just generalize the impact of truck traffic in one location as in another location. So by their very allocation. I take the commission's point that you cannot fault us if you don't give us the objection to respond to. So if you want us to look at a regulation and deal with the commission's interpretation and application of it, then cite the regulation. General objections are simply not enough. I thoroughly understand that. And so finally, in Bacino's court says, you know, as we often say, the agency creates these regulatory systems. It's deemed to know what its regulatory system provides. So, you know, act in conformity with your regulations. And I think a lot of the arguments that you've been making here and in your brief is, you know, nobody made these arguments. It's fine to make them now, but it's too late. And so I think that these objections in the future are going to have to be more precise. And there may be instances, including in this case, where the court thinks there was an adequate. I agree. Notifying the agency. I apologize. No. Yes, Your Honor. And if I could just pick up on one point you made, because this man had also mentioned that they cited 1502.22B with regard to upstream impact. But they only cited it for the proposition that upstream impacts are reasonably foreseeable. They didn't cite it at all for the proposition that, okay, maybe FERC has all these explanations about why it can't determine whether it's reasonably foreseeable. And we don't accept it. But even assuming they're right, you still need to look at theoretical other approaches in the field in order to see if that, you know, if that reasonable foreseeability determination, you know, passes muster. And that goes to your point, Your Honor. Perhaps they could have made a more specific objection. Perhaps they could have cited other methods, tracer analyses that we should have employed, or they thought we should have employed, in order to make a more robust determination. But they didn't do so. In fact, everything they say is ipsy dixit. They just say we had information that was reasonably available, but they don't cite anything for that proposition. Well, I understand that argument, but I'm a little troubled by the notion that the petitioner is the one who is supposed to be the expert on what is out there in terms of the methodology that has been developed in the industry or in the academy. When the regulation puts an obligation on first. Anyway, not to expand this. Anything further? I know you said your time was up, and I said, give us a couple of sentences. Anything more? I could give you a couple sentences on market need that might just come up in 30 seconds. I think there's a little confusion here on the public need analysis that goes into the balancing public or public benefit analysis. And the finding of public convenience and necessity. They're two different things. The finding of public convenience and necessity is our certificate order. That's our December 2019 order, which, by its terms, considers both the balancing test and the NEPA analysis. It comes last. And so by arguing in the reply brief at pages five to six that we determined public convenience and necessity before we conducted the NEPA analysis is just wrong on the record. They're two different things. And finally, I would just say our finding of no significant impact is reasonable here. 95% of this project is already built. It's already in operation. 81% of the new 4.7 miles of pipeline being built is is constructed along existing rights of way. And both of the compressor stations, Marcus Hook and Quaker Town, are built on existing facility sites, which, as Mr. Blasey stated, already have industrial equipment on them. I thank your honors. I ask that the court deny the petition for review. Did the council have an opportunity to fully address the townships arguments? I'm happy to address the townships arguments as well. Can you just simply give us the sort of thumbnail as to why Mr. Blasey is wrong? Yes. Yes, your honor. First, our obligation under NEPA is to offer a brief discussion of alternatives. We did that by looking at five different alternative or four different alternative sites to the Quaker Town site. And the question under Mini-Sync is whether we clearly address the issue. We did that for all the five preserved issues. And Mr. Blasey and Ms. Manninghead are incorrect in relying on comments they made on the environmental assessment as a basis for arguing that this court has jurisdiction over objections that were not made in their rehearing applications. All right. So let's thank you very much, council. Thank you, your honor. All right. We'll hear from Mr. Marwell for intervener. Thank you, your honor. Jeremy Marwell, counsel for intervener at Adelphi Gateway. If I could, I'd like to touch briefly on the preservation point, then discuss downstream. And I would also like to talk about the status of the project since we're several months after the brief that we filed in the court. With regard to preservation, we agree with the commission that this issue was not fairly put before the commission in the sense of giving them a fair opportunity to address it. The rehearing request is JA-795. And I think if you read that, there's one sentence with an unexplained footnote in the context of an argument where Delaware people were saying, these are the numbers we think would be generated if you apply the social cost of carbon tool. They said $80 million, $20 billion, whatever it was. And so to drop an unexplained footnote, particularly in the context where the commission has repeatedly explained its reasons for not using the social cost of carbon, and this court has repeatedly upheld them, we think that glancing reference is not enough to put the commission on notice that they were making the distinct argument that was at issue in the keynote and that they're making now in this court. With respect to- Are you citing 795? That's right, Your Honor. As I understand it, that is Delaware Riverkeeper's rehearing request before the commission, which is the jurisdictional prerequisite for preserving an argument in the court. Right. I'm just looking specifically. Because you said it's not enough to drop a footnote. Yeah. The sentence is the first sentence of the second paragraph on that page. The sentence reads, the scientific- sorry, the SCP, that's social cost of carbon, is a scientifically derived metric to translate tonnage of carbon dioxide or other greenhouse gases to the cost of a climate harm and remains generally accepted in the scientific community. Footnote 360 is a cite to the regulation or a sub provision of the regulation. In the context of what this section of their recurring request is arguing, and given the fact that the requirement to raise an issue with specificity is explicit in the statute, and this court has said you have to raise it with particularity, the argument that I think is now being made, which is regardless of the commission's longstanding arguments and position about why they won't use the social cost of carbon, it had an obligation under that regulation to use it anyway, I don't see that fairly- Well, I appreciate your argument, but I also know that while this court has talked about the obligation to make your objection specific, when we cited that specific requirement for regulation, when the case got to the Supreme Court, it made short shrift of that. And said that the objection was adequately presented. So I think we have to give some credence to the notion that the expert agency knows what's going on here when the argument is presented in the context of arguing that FERC has failed to use this methodology. And we have some authority suggesting that the extent this court has deferred previously to FERC's notion that this is unreliable, et cetera, that that is no longer a legitimate reason for rejecting the methodology. So I take your point, though. They don't focus on the regulation the way they did in the other case on which they rely, and they don't quite make the specific argument that we're suggesting. So is your position, then, that even though in making an argument, FERC has cited the relevant regulation, your argument is more than it needs to do more than put it in a footnote. Your argument is even were it in the body of the petition, there has to be some explanation of how this regulation is demanding of FERC more than what it did. I think that's right, Your Honor. I mean, I do think it's interesting that it's only in a footnote. But in addition, there are no words in that paragraph of the hearing request that say, FERC, we recognize that you've given these reasons. We recognize you've been upheld. But nonetheless, this regulation compels you to do something different. I don't see those words. I see a passing reference to their assertion that it's generally accepted. I don't see the separate legal argument. Which, Mr. Maskell, you would have expected them to make after the long history of them saying similar things and FERC responding in the way that it had and this court upholding it. So we're now in a world of a new argument about the regulation, I would think, that we would have expected to see in the text. This is a new argument. Please focus on it. Here's what we're saying. Precisely. Because otherwise, I mean, if the court has already upheld the same reasons that are being articulated here, where is the argument going? And, I mean, it's 140-something page rehearing request with 400-plus footnotes. You know, I do think it's important to have the reasonable burden on the commission. And what does a rehearing order look like if this kind of glancing reference is enough to preserve for appeal? Then, obviously, the commission is going to need to respond to all such glancing references. Well, the commission's EAs are no longer 25 pages long. No, they're not. But there has also been pressure on the commission, and I mean, the commission can speak to this, to move more quickly on rehearing orders in response to this court's en banc decision. So I do think there is, I mean, there has to be some, there is value in the court's traditional view that this is an argument. Arguments need to be raised with particularity and that's a jurisdictional requirement of this court's case. Can you quickly do downstream consequences before your time runs out? Yes, and I think I may be out already, but I'd be happy to. I would urge the court, I know there were a number of important and perhaps broader questions raised about downstream, but we have a record here, and we have specific arguments that were raised. And I understand the argument raised in the blue brief to be FERC should have quantified downstream emissions from burning gas at the Calpine plant, which was off something called the Parkway Lateral. And what FERC said in response to that, well, they asked us, you know, do you have a contract? What's your contract on Zone South? And we said, well, it's actually a contract with a shipper going to an interconnection with another interstate pipeline system. We did not have a contract with the Calpine plant going off the Parkway Lateral to this day. We do not have a contract with Calpine going off the Parkway Lateral. And we said, no, the gas is going into the broader interstate pipeline system. So I think if Berkhead is the law, and in Berkhead the court said they rejected both arguments from left and right that said stable trail is not limited to facts, but also stable trail doesn't mean that it is always an indirect effect. And here I would propose that when you have a project that is largely interconnecting the existing pipeline grid, providing optionality and, you know, other pathways for gas, this is sort of the extreme case where it is hardest to make a prediction, because all you know is some incremental capacity that's going into the broader grid. And I understand the instinct that's been articulated that the commission needs to do something and make reasonable inferences. But I do think it's important to understand that FERC created a highly liquid market for this transportation capacity, and it is released, it is purchased by some shippers, it is released when they don't need it, and that's why it works well. And so, you know, it could be that the gas is going to replace, be a more reliable substitute for gas being used by a plant. That's what we know would have been true for Calpine had they ever bought service from us. They already had gas, but this would have been an alternate source. That's sort of like the power plants in the north. Or it could be like the Kimberly-Clark plant where we know this gas was used to demolish a coal-fired, a waste coal-fired plant. So that's on that ameliorative. And I think if you read, the fairest reading of Staple Trail and Birkhead is that the commission can and has to make judgments in light of the nature of this market. I mean, I understand the instinct, but the notion that you can have a tracer or something like, where is a particular electron going to go in the power grid? The whole point and value and redundancy and strength of this network is that it is highly liquid. Well, I think that's very helpful, actually, Mr. Marwell. Thank you, Your Honor. Could I briefly address the status of the project? Yes. Okay. The zone north, which is the portion of the project which replaced existing service to two power plants that have no backup source gas, has been in service since day one. That's where we just bought the asset, the existing pipeline that has been in the ground since the 1970s. The zone south facilities remain under construction. There's been a little bit of slippage in some of them, but they are actively under construction. Some of them will be ready for service later this year, November, December. Others are going to slip a little bit. But those facilities, as we said in our brief, are needed. And, in fact, as the commission contemplated in its order, Adelty has continued to seek shippers, you know, customers. And the pipeline today is 98% subscribed. So we've had additional evidence of need. I'd be happy to answer questions about Upstream or anything else. I'm sorry. That last set of comments was about remanding without vacater as opposed to lift. Is that what you are addressing? Are you trying to talk about mootness sort of? Oh, no, I wasn't making a mootness suggestion, Your Honor. I think court cases would weigh against us on mootness. No, I was hoping that we don't get to remand without vacater. But recognizing that there's been some vigorous discussion, I just wanted to emphasize, you know, this is not a case. I mean, this is an unusual case in some respects because the pipe has been in the ground since the 1970s. And so the court has addressed the circumstances where you might vacate. There's concern about sort of rushed construct and do the environmental review later. I would suggest that's not at all what's happening here. And I would just urge that the consequences of vacater would be very severe here, particularly for the northern segment where there's been no environmental effects at all. It's just a paper. We bought it from the other owner and we continued exactly the same service that these power plants have been taking. So we certainly think you should deny the position. But if you were to remand on anything, particularly because the court remanded without vacater in Vecinos where the same CEQ regulation was at issue. This seems like a substantially stronger case for application. All right. Thank you very much. Thank you. Oh, counsel for Delaware River. You have a couple of minutes. Thank you, Your Honor. I'd just like to emphasize, as Mr. The citation at J.A. 0795, where we did raise the point on the hearing that that was required to use social cost of carbon because it's generally accepted in the scientific community. I think, you know, regardless of whether it's in a footnote or not, it's a citation to a regulation that they're required to follow. And that regulation specifically says that the agency's evaluate. Help me out then. I mean, what I found particularly helpful. Mr. Marwell saying essentially we're in a changed. Energy world. Congress authorized. These are my words, not his, but Congress authorized for to do precisely what it's done here. And now we have this very liquid and expensive market that ultimately is to benefit the consumer through reliable supply at reasonable cost. And in that context, the requirement that the objection be specifically stated. In a petition for rehearing seems to me. Have particular significance. What's your response to that? Well, our response is that we believe we sufficiently raised that objection here. We specifically stated that it's generally accepted in the scientific community. Referred to the regulation, which says that the agency needs to use generally accepted methods. We pointed out how cost monetization is appropriate where there's alternative modes that aren't that can't be used. We're basically saying this, Manningham, you might have something in terms of your suggestion that that was enough to preserve the argument that had to do it. If we all agree that the regulation that you're pointing to is applicable in this circumstance. This takes us all the way back to Judge Silberman's very first question, which is given that there is not universal acceptance that the regulation that you cited applies in the EA context. Then you're just citing to that regulation. It seems to me does not go far enough. To make the point in and of itself that FERC had to do it in this context. This citation could very well mean, look, you might have had to do it in EIS world because it's generally scientifically whatever. In this context, we are just pointing to that to show you that this is a really good tool. Other courts have done it. If you would pick EIS, you probably would have had to do it. But we understand your EA world and our corpus of arguments are no different than what we have been saying all along. And that you've responded to all along, which is just we really think this is great and you should do it. I feel like you needed to say more, at least at the threshold of this regulation applies to this circumstance. And as a result, you don't have a choice. And I don't see that in this document. And Mr. Fish says you point to maybe saying that somewhere else. But you can see that this would be the relevant document that we need to look for to determine whether or not you preserve this issue. Yes, Your Honor, this is the relevant document. And 795 is the place. 795 is where you say you preserve this issue. Yes, Your Honor. OK. But overall, essentially when it comes to downstream emissions, there are some discussions, extensive discussion with Mr. Fish on downstream emissions and whether the 97 percent figure is sufficient to essentially estimate the amount of greenhouse gas emissions. What this court says in Berkhead is it does not contradict that. What this court says in Berkhead is that it's not categorically reasonably foreseeable in every circumstance that all capacity on a pipeline is going to be is going to be combusted. And that's true. She'll have to call you back. That is true in the context where there is information in the record that the gas is going to be used for another purpose. For example, if there was information in the record that some of the capacity was going to a chemical plant, we would concede that it's not categorically reasonably foreseeable that that portion of gas is going to be combusted. But when you have a statistic such as 97 percent, I think that then you can say it is reasonably foreseeable that the gas that you cannot identify a specific end use for is going to be combusted. Finally, the essential issue here is that the public needs to understand exactly how these projects are needed, why this gas needs to be transported, why this gas needs to be combusted to bring necessary gas to the public, especially in the context of climate change, one of the most pressing issues of our time. And when this industry combusts fossil fuels, we need to understand that these projects are needed. So some of these questions about where the gas is coming from and where the gas is going to is very pertinent. And even sometimes in the context of when pipelines are describing their projects, they'll say, hey, we're trying to bring gas from this shale region to this market. And as the public, we expect FERC to understand those dynamics and to tell us exactly how they're going to impact the public. Thank you, Your Honor. Thank you. All right. Counsel for Petitioner Wes Brockey's township, Mr. Blasey. I told this honorable court that I would provide a case citation on the 40 acre principle that the industry believes is present. So I just realized I forgot. I didn't. So that was Delaware Riverkeeper versus U.S. Army Corps of Engineers. It's found that 869 Fed Third 148 in 2017. It's the Third Circuit. Let me just quote what they say. So this goes back to this presumption that's broadly held that compressor stations, which are industrial facilities, which didn't in any level preexisted Quaker Town, need more space. So Tennessee's gases application on October 9, 2015, Tennessee Gas submitted an application to FERC for approval of the Orion project. Its application included an environmental report which discussed and rejected compression alternatives. Tennessee Gas explained that building compressor stations would require Tennessee Gas, quote, to obtain approximately 40 acres per site per end, total of 80 acres, close per end, close quotation. And it goes on. So this is the Third Circuit reporting on this. This is another example of what is perceived as needed to build a safe station. And here we're told 1.5 acres is okay. Trust us. And that we think is inadequate, completely inadequate. I'm sorry, Your Honor. I kept talking. I've got some more things to say, but what was your question? No, no, it's all right. I just wanted to highlight Mr. Fish's point that FERC believes its obligation is to consider and discuss the alternatives. You seem to be suggesting with that case that they need to discuss the alternatives in a certain way, that they need to specifically address the inadequacies of the other places, the other alternatives. And I'm kind of wondering where that level of duty comes from. Do we have cases that suggest that in their discussion of the alternatives or is there a regulation that says we have to lay out exactly what we found to be problematic with the other places? I don't. And I guess I would look for that and ask permission and obviously expect responses from others if you wanted us to do that. I can't off the top of my head. My perception of the environmental assessment process has always been that you look for these issues and if something broader is lurking, that's what triggers. You've got to use your judgment as the administrative agency to seek more. And what we've been saying is what is in front of them as fact leads you to say we are out of sync with practice and fact and we need to do more. Now, as I said, more could be, and this is FERC's authority, and my client may say, oh, keep your mouth shut on this. But FERC could have said, oh, 20 or 25 acres here can be obtained. There's some large properties. Acquire a few of them. We can make a safe site here. We want it here. And we probably would have very little reason to say you really need to consider or take the other alternative. The reason we say the other alternative was given short shrift was that it already was sized to what appears to be industry practice and they just dismiss it. Oh, don't need to do it. That's what was so bothersome about that. Now, yes, in an EIS process, clearly the alternatives would have been given greater consideration, all of the implications. I can look for a case if this course wants and we'll try to find it very quickly that talks about the interface between EA and EIS on an issue like this and see if we can be helpful. All right. Any other argument? I just have one last kind of set of information to give. Again, Judge Silverman had asked what were the or maybe it was you, Judge Jackson, where we had raised these issues. And they're in the I call them the R references because there are many pages. One was R890. The second time the township raised was the R920. And finally, R939 was the rehearing petition that we offered. So our request to this court is to make sure that the reason we want to remand to the agency is that it develops and proposes for the public a safe project that people can have confidence in. And we think it is lacking at this point given the decision that's been made. All right. Thank you all. We'll take the case under advisement.
judges: Rogers, Jackson, Silberman